UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAYLOR SOLLINGER, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br>        v.<br><br>SMILEDIRECTCLUB, LLC,<br><br>                              Defendant. | Civil Action No. 1:19-cv-05977 (JPO) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
David J. Stone
885 Third Avenue, Suite 3040
New York, NY 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
eagel@bespc.com
stone@bespc.com

and

**MOORE & KUEHN PLLC**

Justin A. Kuehn
Fletcher W. Moore
30 Wall Street, 8th Floor
New York, NY 10005
Tel: (212) 709-8245
jkuehn@moorekuehn.com
fmoore@moorekuehn.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ………………………………………………………………1

STATEMENT OF FACTS ……………………………………………………………..4

    A.  SmileDirectClub Falsely Represented That Customers Will be Assessed and Monitored By Licensed Dentists ……………………………………………………………4

    B.  SmileDirectClub's Aligners Caused Significant Damage to Plaintiff's Teeth ……………5

    C.  SmileDirectClub's Terms of Use Provide For Exclusive Venue in Courts Located In Southeastern Michigan ……………………………………………………………6

    D.  SmileDirectClub Attempted to Hide an Arbitration Agreement in Its "Informed Consent" Disclosure ……………………………………………………………8

ARGUMENT……………………………………………………………………10

    I.     Applicable Standard …………………………………………………………10

    II.    The Parties Did Not Form An Agreement To Arbitrate ……………………………..11

        A.  The Court, Not the Arbitrator, Decides Whether the Parties Formed an Agreement to Arbitrate …………………………………………………………11

        B.   The Purported Arbitration Agreement on SmileDirectClub's Site Was Not Clear and Conspicuous …………………………………………………………12

            1.  Applicable Standard …………………………………………………..12

            2.  The Purported Arbitration Agreement Was Not Clear and Conspicuous ..14

            3.  There was No Agreement to Arbitrate …………………………………...19

CONCLUSION ………………………………………………………………23

## TABLE OF AUTHORITIES

**Cases**

*Applied Energetics, Inc. v. Newoak Capital Mkts., LLC,*
    645 F.3d 522 (2d Cir. 2011).................................................................... 10, 21

*Armstead v. Starbucks Corp.,*
    2017 U.S. Dist. LEXIS 190748 (S.D.N.Y. Nov. 17, 2017)........................ 20

*Bank Julius Baer & Co., v. Waxfield, Ltd.,*
    424 F.3d 278 (2d Cir. 2005)...................................................................... 21

*Bensadoun v. Jobe-Riat,*
    316 F.3d 171 (2d Cir. 2003)...................................................................... 10

*Berkson v. Gogo LLC,*
    97 F. Supp. 3d 359  (E.D.N.Y. 2015) .................................................. 12, 14

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147  (2d Cir. 2002)..................................................................... 10

*Contec Corp. v. Remote Solution, Co., Ltd.,*
    398 F.3d 205 (2d Cir. 2005)...................................................................... 11

*Cullinane v. Uber Techs, Inc.,*
    893 F. 3d 53 (1ˢᵗ Cir. 2018)...................................................................... 14

*Doctor's Assocs. v. Alemayehu,*
    934 F.3d 245 (2d Cir. Aug. 14, 2019)....................................................... 11

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995).................................................................................. 10

*Fteja v. Facebook, Inc.,*
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)....................................................... 20

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    561 U.S. 287, 302 (2010)..................................................................... 10, 11

*Hearing Consultants v. J2 Global Communs.,*
    2015 Mich. Cir. LEXIS 133 (Mi. Cir. Ct. Dec. 26, 2015)......................... 13

*Hines v. Overstock.com, Inc.,*
    380 Fed. Appx. 22 (2d Cir. 2010).............................................................. 12

*Howsam v. Dean Witter Reynolds,*
    537 U.S. 79 (2002).................................................................................... 10

ii

*JPay, Inc. v. Kobel,*
904 F.3d 923 (11th Cir. 2018) ................................................................ 10

*Kernaghan v. Forster & Garbus, LLP,*
2019 U.S. Dist. LEXIS 32268 (E.D.N.Y. Feb. 25, 2019) ........................ 12

*Meyer v. Uber Techs, Inc.,*
868 F. 3d 66 (2d Cir. 2017) ................................................... 12, 13, 14, 20

*Nguyen v. Barnes & Noble Inc.,*
763 F. 3d 1171 (9th Cir. 2014) .............................................................. 13

*Nicosia v. Amazon. Com., Inc.,*
834 F.3d 220 (2d Cir. 2015) .................................................................. 14

*Nicosia v. Amazon.com, Inc.,*
2017 U.S. Dist. LEXIS 133701 (E.D.N.Y. Aug. 18, 2017) ...................... 10

*Noble v. Samsung Elecs. Am., Inc.*
682 Fed. Appx. 13 (3d Cir. 2017) ......................................................... 14

*Plazza v. Airbnb, Inc.*
*289 F. Supp. 3d 537 (S.D.N.Y. 2018)* ............................................. 19, 20

*Resorb Networks, Inc. v. YouNow.com,*
30 N.Y.S.3d 506 (N.Y. Sup. Ct. 2016) ................................................... 13

*Schnabel v. Trilegiant Corp.,*
697 F.3d 110 (2d Cir. 2012) ............................................. 10, 12, 13, 14

*Specht v. Netscape Commc'ns Corp.,*
306 F.3d 17 (2d Cir. 2002) ................................................. 12, 13, 22

*Stark v. Squaretrade, Inc.,*
913 F. 3d 279 (2d Cir. 2019) ................................................................. 12

Plaintiff Taylor Sollinger, on behalf of himself and all others similarly situated, respectfully submits this Memorandum of Law in opposition to the motion by defendant SmileDirectClub, Inc. ("SmileDirectClub") to compel arbitration and stay proceedings.  SmileDirectClub's motion must be denied because there was no agreement between Sollinger (and all others similarly situated) and SmileDirectClub to arbitrate disputes.  In the alternative, the Court should permit Plaintiff to conduct discovery concerning SmileDirectClub's website and the purported arbitration agreement.

## PRELIMINARY STATEMENT

SmileDirectClub sells devices that move and alter its consumers' teeth.  Although other companies sell similar devices, SmileDirectClub distinguishes itself by not requiring customers undergoing the teeth re-alignment to make periodic visits to a SmileDirectClub-affiliated (or any) dentist to monitor and oversee the progress of the realignment process.  Cutting out the medical supervision, of course, allows SmileDirectClub to offer dental services at a much lower cost, but at much greater risk to SmileDirectClub's customers – its patients.  In order to assuage consumers' concerns about the treatment they will get, SmileDirectClub's website repeatedly informed consumers that their teeth would be evaluated by a SmileDirectClub affiliated dentist or orthodontist, to determine whether the SmileDirectClub aligners are appropriate, that the dentist or orthodontist will evaluate each consumer's specific circumstances, including medical and dental history, and that the dentist or orthodontist will be available to answer any questions throughout the treatment period.  These assurances were false and misleading.

Plaintiff Taylor Sollinger signed up for and began using the SmileDirectClub aligners.  He was not seen by a dentist or orthodontist prior to receiving the aligners and he was not assigned a dentist or orthodontist to monitor his care.  When he contacted SmileDirectClub after he began experiencing extreme pain, he was still not provided access to a SmileDirectClub dentist or

1

orthodontist.  Instead, Mr. Sollinger eventually went to his own dentist, who informed him that the SmileDirectClub aligners cracked and damaged his teeth and gums.  Mr. Sollinger is informed and believes that few, if any, of SmileDirectClub's customers are actually pre-reviewed by a dentist or orthodontist prior to receiving the aligner treatment, and few, if any, are monitored by a dentist or orthodontist during the process.

Plaintiff brings this action individually and on behalf of a class of SmileDirectClub consumers seeking, among other things, injunctive relief to correct the false and misleading statements on SmileDirectClub's website (and elsewhere) and for damages for the pain and suffering caused by SmileDirectClub's aligners.

SmileDirectClub responded by attempting to move this action from the public venue of the courts to a private arbitration.   SmileDirectClub contends that Plaintiff agreed to SmileDirectClub's "Informed Consent" documents when registering for SmileDirectClub services on its website and that the Informed Consent document contains a valid arbitration agreement. SmileDirectClub's motion to compel arbitration must be denied because the parties did not – and, indeed, none of the class members – form an agreement to arbitrate.

When an on-line vendor wishes to form an agreement to arbitrate with a customer by asking the customer to "click" a box to accept certain terms, the customer must be on "reasonable notice" of the arbitration provision.   The terms must be clearly and conspicuously presented to the customer, even if the customer fails to actually view the relevant document.  Absent reasonable notice of such terms, no agreement to arbitrate is formed, and the motion to compel must be denied.

The evidence before the Court demonstrates that SmileDirectClub's purported arbitration provision was not clear and conspicuous and that neither Mr. Sollinger nor any other class member was on reasonable notice that agreeing to SmileDirectClub's terms constituted a waiver of the right

to seek redress in courts of law.  SmileDirectClub's website asked consumers to click a box agreeing to the terms of three linked documents, "Informed Consent," "Terms" and "SmilePay Conditions."  SmileDirectClub did not require that the consumer actually read the documents, affirm that they had read the documents, or affirm that they agreed to the terms despite not reading the documents.  More importantly, the document labeled "Terms" contained an introductory clause, omitted from the exhibit filed with SmileDirectClub's papers, providing that its terms governed the customer's use of the SmileDirectClub website and "Services" offered on the website, including the SmileDirectClub aligners.  The Terms *did not contain an arbitration provision*.  Instead, it contained a provision selecting the federal and state courts in Southeastern Michigan as the exclusive venue for any claims and providing that Michigan law would apply.

SmileDirectClub hid its purported arbitration provision in a second document, titled "Informed Consent."  By its title, a reasonable consumer would think that this document provided medical information about the risks and benefits of the SmileDirectClub aligners, which, in fact, it did.  The Informed Consent document did not purport to be the parties' "Agreement" and did not purport to set forth terms that governed the parties' relationship.  Further, the purported arbitration provision was snuck into a long list of nineteen "Aligner Risks" as number eighteen.  It was not set forth in a separate section on legal terms; nor was it included in the section whereby the consumer actually gave informed consent.

Defendant bears the ultimate burden of proving the existence of an agreement to arbitrate and must show that the arbitration provision was presented clearly and conspicuously so that a reasonable consumer was on reasonable notice that he or she was waiving their access to the courts. The evidence before the Court demonstrates that Defendant cannot meet this burden. SmileDirectClub chose instead to hide the arbitration provision in a document addressing non-

legal "Informed Consent" issues.  SmileDirectClub presented a separate document titled "Terms of Use," which contained a Michigan venue and law provision – flatly contradicting any suggestion that consumers would be expected to arbitrate.

The Court should rule that SmileDirectClub's website did not create an arbitration agreement with Mr. Sollinger or any SmileDirectClub customer and deny the motion to compel. In the alternative, the Court should permit discovery and hold an evidentiary hearing to determine whether the parties formed an agreement to arbitrate.

## STATEMENT OF FACTS

### A. SmileDirectClub Falsely Represented That Customers Will be Assessed and Monitored By Licensed Dentists or Orthodontists

SmileDirectClub hosts and maintains an Internet website (the "Site," located at www.smiledirectclub.com).  (Complaint ¶¶ 2 & 3.)  The Site represents, on numerous pages, that SmileDirectClub provides licensed dentists and orthodontists to review, assess, monitor and supervise customers' use of the SmileDirectClub aligners.  The site represents:

- A licensed dentist will assess your smile and determine if SmileDirectClub aligners are the best fit for you.  If they determine they're not, the cost of your impression kit or scan is fully refundable." (*Id.* ¶ 3.)

- SmileDirectClub aligners offered through a network of over 225 duly licensed dentists and orthodontists. These doctors have many years of aligner therapy experience.  Each SmileDirectClub customer is assigned a dentist or orthodontist who is licensed where they live. (*Id.* ¶ 26.)

- Your provider will assess your individual case, including your medical and dental history, and determine if SmileDirectClub invisible aligners are the right fit for you." (*Id.*)

- "Your doctor will oversee your new smile, and every 90 days you'll be able to check in with them when you log into your account. You can reach out to your doctor at any time through the dental team by phone or through your online account." (*Id.*)

- "An individual who is requesting treatment by using SmileDirectClub's aligners is receiving the same level of care from a treating dentist or orthodontist as an

4

individual visiting a traditional orthodontist or dentist for treatment. The teledentistry platform allows for more convenient access and flexibility for individuals who may not have access to local care," says Jeffrey Sulitzer, DMD, Lead Dentist at SmileDirectClub. (*Id.*)

- "We define quality as the intersection of customer satisfaction and the Standards of Care. Our affiliated network will always do their absolute best to make customers happy with the results of their smile. We utilize the Standards of Care established by the dental professional community," says Dr. Sulitzer. (*Id.*)

These representations are false. Plaintiff received and used SmileDirectClub aligners, but was never seen or assessed by a dentist or orthodontist, was never assigned a dentist or orthodontist by SmileDirectClub, and never given the opportunity to speak with a SmileDirectClub dentist or orthodontist, even after Plaintiff complained that the SmileDirectClub aligners caused significant damage to his teeth and gums.

**B. SmileDirectClub's Aligners Caused Significant Damage to Plaintiff's Teeth**

In or around October 2017, Plaintiff paid for, received and began regular use of SmileDirectClub's aligners. (*Id.* ¶ 4; Declaration of Taylor Sollinger in Opposition to Motion to Compel Arbitration ("Sollinger Decl.") at ¶¶ 1-3).) Plaintiff visited a SmileDirectClub "SmileShop" in New York City. (Compl. ¶ 15.) At the visit, Plaintiff had his teeth scanned by a SmileDirectClub representative who was not a dentist, and he subsequently received SmileDirectClub aligners. (*Id.* ¶ 16.) At no time during his visit or otherwise was Plaintiff seen by a licensed dentist or orthodontist, and no licensed dentist or orthodontist was assigned to Plaintiff. (*Id.* ¶¶ 16, 18; Sollinger Decl. ¶ 2, 4.) On October 13, 2017, Plaintiff paid $1,700 for his aligners. (Compl. ¶ 17; Sollinger Decl. ¶¶ 2-4).) Plaintiff returned the first two sets of aligners for improper fit, and began using the third. (Compl. ¶ 18.) By the end of December 2017, Plaintiff began experiencing daily pain in his teeth and gums. (*Id.* ¶ 18.) Subsequently, Plaintiff's personal dentist informed him that the SmileDirectClub aligners had damaged his teeth and gums, cracked his teeth and that he required fillings. (*Id.* ¶ 21-23.) The dentist attributed Plaintiff's pain and

damage to the SmileDirectClub aligners, and advised Plaintiff never to wear the SmileDirectClub aligners again.  (*Id.* ¶¶ 21, 22.)

Despite numerous communications to SmileDirectClub, SmileDirectClub never took any steps to correct or compensate Plaintiff for the damages he suffered due to SmileDirectClub's aligners.  (*Id.* ¶ 24.)

### C. SmileDirectClub's Terms of Use Provide For Exclusive Venue in Courts Located In Southeastern Michigan

In order to register for SmileDirectClub's aligners, customers, such as Plaintiff, must first register on SmileDirectClub's Site.[1]  To do so, Plaintiff must agree to three separate documents, "SmileDirectClub's Informed Consent and Terms & SmilePay Conditions" by clicking a box on a pop-up dialog.[2]  SmileDirectClub submitted with its moving papers exhibits purporting to be the "Informed Consent" and "Terms."[3]  Notably, the Skinner Affidavit does not assert that these are the same versions that were presented to Plaintiff when he purportedly visited the SmileDirectClub website on October 5, 2017, and neither document contains a "Last Revised" date.  Moreover, the documents submitted by SmileDirectClub do not include the introductory language that appears on the actual versions.  Complete versions of the "Terms" and "Informed Consent" in effect on October 2017 are attached as Exhibits A & B, respectively, to the Declaration of Justin Kuehn ("Kuehn Decl.") submitted herewith.[4]

Although the pop-up dialog seeking agreement to the terms merely uses the word "Terms," the SmileDirectClub "Terms" in fact refers to SmileDirectClub's "Terms of Use," purportedly a legally binding agreement, as opposed to defining terms used on the Site.[5]  Users of the Site,

---

[1] Affidavit of Justin Skinner in Support of Defendant's Motion to Compel Arbitration ("Skinner Aff.") (Dkt. 11-2) at ¶¶3-4.
[2] Skinner Aff. Ex. 3.
[3] Skinner Aff. Exs. 1-2.  SmileDirectClub did not submit a copy of the SmilePay Conditions.
[4] Notably, the current Terms of Use on the Site also contain the introductory paragraph.  Kuehn Decl. Ex. D.
[5] Kuehn Decl. Ex. A.

however, are left to guess at what "Terms" refers to, unless they clicked on the hyperlink. SmileDirectClub's Motion fails to explain why the pop-up dialog box does not inform consumers that they are agreeing to "Terms of Use" that affect the legal relationship between the parties unless the consumer clicks through to the document.

The Terms of Use defines itself as the "Agreement" and provides that it governs customers' "use of SmileDirectClub.com (the 'Site') and the shopping **and other services (the "Services")** offered on the Site."[6]   The term "Services" refers to, *inter alia,* the use of the SmileDirectClub aligners.  For example, the Terms of Use provides that "[t]he Site and the Services are not intended for users under the age of 18.  To register for any Services offered on the Site . . . ."[7]   Indeed, Defendant concedes that the SmileDirectClub aligners are offered exclusively through the Site, even if the customer obtains them at a SmileShop: "A consumer cannot become a customer or receive services without registering."[8]

The SmileDirectClub Terms of Use includes an express choice of law and venue provision:

**Jurisdiction and Governing Law**

SmileDirectClub makes no representation that the Site Information, the Services or products offered through the Site are appropriate, available or legal in any particular location.  Those who choose to access the Site Information, the Services and products offered through the Site do so on their own initiative and are responsible for compliance with local laws, if and to the extent local laws are applicable.  You agree that this Agreement, for all purposes, shall be governed and construed in accordance with the laws of the State of Michigan and any action based on or alleging a breach of this Agreement must be brought in a state or federal court located in Southeastern Michigan.  In addition, both parties agree to submit to the exclusive personal jurisdiction and venue of such courts.[9]

The Terms of Use do not contain an arbitration provision.

---

[6] *Id.* (emphasis added).
[7] *Id.* at p.2.
[8] Skinner Aff. ¶ 3.
[9] Kuehn Decl. Ex. A p. 4.

### D. SmileDirectClub Attempted to Hide an Arbitration Agreement in Its "Informed Consent" Disclosure

SmileDirectClub's "Informed Consent" provides, as indicated by the name of the document, information concerning the use and risks of the SmileDirectClub aligners.[10]  Nothing in the pop-up dialog suggests that the Informed Consent document has any other purpose than to obtain the patient's informed consent before using SmileDirectClub's dental devices.  It does not suggest that the document would include concerning arbitrability of disputes arising out of the use of the Site or the aligners themselves.   Unlike the SmileDirectClub Terms of Use, the SmileDirectClub Informed Consent document does not purport to "govern [customers'] use of SmileDirectClub.com, shopping or "Services" offered on the Site, such as the SmileDirectClub aligners.[11]  The Informed Consent does not instruct a user to exit the Site if he or she cannot comply with the terms.  Nothing about the term "Informed Consent" as used on the Site would suggest to a consumer that the document provided anything other than information necessary for the consumer to make an informed decision as to whether to utilize SmileDirectClub's dentistry products.

The six-page "Informed Consent" document is broken up into seven sections:  "How Does the SmileDirectClub Aligner System Work?"; "Aligner Benefits," which contains a list of two benefits; "Whitening Benefits," which contains a single benefit; "Aligner Risks," which contains

---

[10] Kuehn Decl. Ex. B.

[11] The American Medical Association defines "Informed Consent" in its Code of Medical Ethics Opinion 2.1.1 as:

> Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care. Successful communication in the patient-physician relationship fosters trust and supports shared decision making.
>
> The process of informed consent occurs when communication between a patient and physician results in the patient's authorization or agreement to undergo a specific medical intervention.

https://www.ama-assn.org/delivering-care/ethics/informed-consent

a list of nineteen risks, set forth in single spaced paragraphs; "Whitening Risks," with four risks; "Healthy Teeth & Gums" and "Informed Consent."[12]

The **Aligner Risks** section consists of 19 separate subsections, covering three pages of single-space type.  All of the subsections, except one, address the physical risks of using the SmileDirectClub aligners.  Tucked away in the list of physical risks of aligners is the alleged agreement to arbitrate.[13]  Nothing in the document or the "Aligner Risks" heading suggests that a customer would find legal terms or an arbitration agreement in that section.[14]

Although the SmileDirectClub Site "clickthrough" agreement refers to "SmilePay" or "SmilePay Conditions,"[15] SmileDirectClub did not submit a copy of this document with its Motion.  Plaintiff located a third document on the Internet titled "SmilePay Conditions: Retail Installment Contract."[16]

Defendant asserts that the provision was made available to Plaintiff through the Informed Consent and the Terms hyperlink, and that Plaintiff clicked to agree to the Informed Consent and Terms.[17]  Plaintiff does not recall noticing the hyperlinks for the SmileDirectClub "Terms" or the "Informed Consent", and does not recall clicking on either link.[18] Defendant does not assert that Plaintiff actually clicked through to view either document.  Plaintiff was not aware of any arbitration provision in the SmileDirectClub "Informed Consent" document and did not agree to arbitrate any claims he may have against SmileDirectClub.[19]

---

[12] Kuehn Decl. Ex. B.
[13] *Id.* at p.3.
[14] The purported arbitration agreement does not preclude arbitration on a class basis.
[15] Skinner Aff. Ex. 3.
[16] Kuehn Decl. Ex. C.
[17] Skinner Aff. Ex. 4.
[18] Sollinger Decl. ¶ 5.
[19] *Id.* ¶ 6.

## ARGUMENT

### I.    APPLICABLE STANDARD

When determining whether an arbitration agreement exists in the first instance the liberal federal policy favoring arbitration agreements does not apply. *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 302 (2010) (directing courts to apply the presumption of arbitrability "only after the Court was persuaded that the parties' arbitration agreement was validly formed"); *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002) ("a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide").  "Assuming that the parties agreed to arbitrate arbitrability 'might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.'" *JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11ᵗʰ Cir. 2018) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)).  Thus, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. Newoak Capital Mkts.*, LLC, 645 F.3d 522, 526 (2d Cir. 2011).

In determining whether there is an agreement to arbitrate, the court applies a standard similar to summary judgment.  *See Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003). The Court must accept as true the underlying allegations in the complaint.  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).   The Court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." *See Nicosia v. Amazon.com, Inc.*, 2017 U.S. Dist. LEXIS 133701, at *14 (E.D.N.Y. Aug. 18, 2017) ("*Nicosia III*") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).   If a genuine issue of material fact exists concerning the existence of an agreement to arbitrate, the parties are entitled to

discovery and a hearing before a fact-finder.  *See Nicosia III*, 2017 U.S. Dist. LEXIS 133701, at *5 (E.D.N.Y. Aug. 18, 2017) (court permitted arbitration-related discovery on whether parties formed agreement to arbitration).

## II.   THE PARTIES DID NOT FORM AN AGREEMENT TO ARBITRATE

### A.   The Court, Not the Arbitrator, Decides Whether the Parties Formed an Agreement to Arbitrate

"An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all."  *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, at *12 (2d Cir. Aug. 14, 2019).  Just two weeks ago, the Second Circuit expressly and unambiguously held that the court, not the arbitrator, must decide whether the parties in fact formed an agreement to arbitrate.  *Id.* at *11-12 & 12 n.6  The Second Circuit rejected Defendant's argument that, under its prior decision in *Contec Corp. v. Remote Solution, Co., Ltd.*,[20] the parties' incorporation of the American Arbitration Association ("AAA") rules required submission of this question to the arbitrators. (Defendants' Memorandum of Law in Support of Motion to Compal ("Deft. Mem.") (Dkt. 11-1) at 9.)  The court held instead that, even assuming that invocation of the AAA rules required arbitration of "threshold questions," "the Court must resolve the disagreement over the formation of the parties' arbitration agreement before referring the dispute to arbitration."  *Doctor's Assocs.*, 2019 U.S. App. LEXIS 2151, at *12 n.6. (citations omitted).  Although parties may delegate threshold questions of whether an arbitration clause applies to a particular dispute, "parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place."  *Id.* at *11 (citing *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 299-301 (2010)).

---

[20] 398 F.3d 205, 208 (2d Cir. 2005).

**B.  The Purported Arbitration Agreement on SmileDirectClub's Site Was Not Clear and Conspicuous**

**1.      Applicable Standard**

Defendant bears the burden of proving that the parties formed an agreement to arbitrate. *Hines v. Overstock.com, Inc.*, 380 Fed. Appx. 22, 24 (2d Cir. 2010) (citations omitted); *Kernaghan v. Forster & Garbus, LLP*, 2019 U.S. Dist. LEXIS 32268, at *8 (E.D.N.Y. Feb. 25, 2019). Defendant must make a prima facie initial showing that an agreement to arbitrate existed, which shifts the burden to Plaintiff to show that factual disputes exist to "put the making of that agreement in issue." *Hines*, 380 Fed. Appx. at 24.

The threshold question here, as in any arbitration motion, is whether the parties have contractually bound themselves to an arbitration agreement. *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 26 (2d Cir. 2002);[21] *Stark v. Squaretrade, Inc.,* 913 F. 3d 279, 288 (2d Cir. 2019) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015).  "'Mutual manifestation of assent' is the 'touchstone' of a binding contract." *Berkson*, 97 F. Supp. 3d at 388 (quoting *Specht*, 306 F.3d at 29).  "Arbitration agreements are no exception to the requirement of manifestation of assent." *Specht*, 306 F.3d at 30.  *Stark,* 913 F. 3d at 288-89 ("[T]o be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'").

State law principles of contract formation apply to the arbitrability question.  *Meyer v. Uber Techs, Inc.,* 868 F. 3d 66 (2d Cir. 2017).  "The manifestation of mutual asset must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Stark v. Squaretrade, Inc.,* 913 F. 3d 279, 289 (2d Cir. 2019).

---

[21] Although *Specht* was decided under California law, the Second Circuit has recently confirmed that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term."  *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 291 n.8 (2d Cir. 2019).

In the case of web-based contracts, courts apply an objective standard for determining whether the customer will be bound by an agreement to arbitrate. *Meyer v. Uber Techs, Inc.,* 868 F. 3d 66, 74 - 75(2d Cir. 2017). Courts will find assent and enforce an agreement to arbitrate where a *"reasonably prudent user would be on inquiry notice of the terms*." *Id.* (citing *Schnable*, 697 F.3d at 120); *Resorb Networks, Inc. v. YouNow.com,* 30 N.Y.S.3d 506, 511 (N.Y. Sup. Ct. 2016) (noting that when evaluating a transaction occurring online, courts focus on "whether a reasonably prudent offeree would be on notice of the term at issue" and whether the terms of the agreement were "reasonably communicated to the user," because assent is mostly passive online).

Under New York law, courts look to whether the term was obvious and whether it was called to the offeree's attention. *Starke*, 913 F.3d at 289 (citing 22 N.Y. Jur. 2d Contracts § 29 ("[A] party should not be bound by clauses printed on the reverse side of a contract unless it is established that they were *properly called to his or her attention* and that he or she assented to them.")). "Whether a reasonably prudent user would be on inquiry notice turns "on the [c]larity and conspicuousness of arbitration terms . . . [I]n the context of web-based contracts . . . clarity and conspicuousness are a function of the design and content of the relevant interface." *Meyer*, 868 F.3d at 74; *Specht*, 306 F.3d at 30. *Starke,* 913 F.3d at 289; *Nguyen v. Barnes & Noble Inc*., 763 F. 3d 1171, 1177 (9th Cir. 2014). Michigan law is similar. *Hearing Consultants v. J2 Global Communs.*, 2015 Mich. Cir. LEXIS 133, at *3 (Mich. Cir. Ct. Dec. 26, 2015).

Courts have recognized that "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Schnabel*, 697 F.3d at 123. "Clarity and conspicuousness of arbitration terms are important in securing informed assent." *Specht*, 306 F.3d at 30. "If a party wishes to bind in writing another to an agreement to arbitrate future disputes,

such purpose should be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties thereto." *Id.*

The enforceability of web-based agreements to arbitrate has been the subject of analysis in numerous federal court decisions in this Circuit and others. *See, e.g.*, *Starke v. Squaretrade, Inc.*, 913 F.3d 279 (2d Cir. 2019) (refusing to compel arbitration); *Meyer v. Uber Techs, Inc.*, 868 F. 3d 66 (2d Cir. 2017) (upholding agreement to arbitrate); *Nicosia v. Amazon. Com.,* Inc., 834 F.3d 220 (2d Cir. 2015) (holding reasonable minds could differ on the reasonableness of the notice); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012). *Berkson*, 97 F. Supp. 3d at 388 (denying motion to compel arbitration finding, after exhaustive review of various forms of web-based so called "wrap" agreements, that the "design and content" of Gogo's website did not demonstrate that plaintiff Berkson knew he was binding himself to such an agreement). *See also Cullinane v. Uber Techs, Inc.*, 893 F. 3d 53 (1st Cir. 2018) (finding that the terms of the agreement to arbitration were not reasonably communicated to plaintiffs); *Noble v. Samsung Elecs. Am., Inc.*, 682 Fed. Appx. 13, 116 (3d Cir. 2017) (arbitration clause will only be binding when the terms are reasonably conspicuous rather than proffered unfairly or with a design to conceal or de-emphasize its provisions) *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171 (9th Cir. 2014 )  What emerges from these cases is that ultimately, determinations as to whether to grant or deny a motion to compel remain a fact specific inquiry that requires the Court to consider the specific facts in each case to determine whether, objectively, the agreement to arbitrate was sufficiently clear and conspicuous to force a plaintiff to arbitrate a dispute where there is no evidence the plaintiff actually knew about or agreed to arbitrate disputes. *See Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 233-234, 238 (2d Cir. 2016).

### 2. The Purported Arbitration Agreement Was Not Clear and Conspicuous

SmileDirectClub does little more than assert that a consumer registering with the SmileDirectClub Site must click to confirm agreement with SmileDirectClub's "Informed Consent and Terms & SmilePay Conditions."  (Deft. Mem. at 13-15.)   SmileDirectClub ignores that the Terms of Use contains a conflicting venue provision mandating venue in "a state or federal court located in Southeastern Michigan."[22]  SmileDirectClub fails to offer any explanation as to why SmileDirectClub would hide a purported arbitration agreement in a document titled "Informed Consent" and slip the provision in as the eighteenth of nineteen "Aligner Risks".  Thus, even if the Court finds that SmileDirectClub met its prima facie case, the undisputed evidence demonstrates that SmileDirectClub cannot meet its ultimate burden to prove the existence of the arbitration agreement.  At the very least, the parties must conduct discovery and an evidentiary hearing on the issue.

The SmileDirectClub sign up page appears to have been designed to conceal the existence of an arbitration agreement.  SmileDirectClub does not give notice of any terms until after a consumer agrees to purchase a SmileDirectClub product, at which time the consumer is asked to complete his or her membership.  Thus, the page on which SmileDirectClub discloses the existence of Informed Consent and Terms & SmilePay Conditions begins in bold letters, "Thank You For Your Purchase."[23]  It then represents "Now, all you need to do is create a password and enter your date of birth below to finish setting up your account."[24]  The consumer also must click on whether the account is for him/her or someone else.  Only then does the consumer get to the box to click to agree to SmileDirectClub's "Informed Consent" and Terms & SmilePay Conditions.  There is no

---

[22] Skinner Aff. Ex. 2 at p. 5.
[23] Skinner Aff. Ex. 3
[24] *Id.*

warning that the three documents include an agreement to waive the consumer's legal access to courts.

SmileDirectClub itself is apparently confused as to what documents exist.  The webpage clearly refers to three separate documents:  Informed Consent, Terms and SmilePay Conditions. Yet, in its papers, SmileDirectClub attaches and refers only to two:  Informed Consent and Terms. Notably, neither of those documents mention SmilePay at all, and a separate SmilePay Conditions document exists.[25]   More importantly, the SmileDirectClub Terms and Informed Consent documents found on the Internet contain headings that do not appear on the versions of these documents that SmileDirectClub submitted with its moving papers.[26]   Thus, the "Terms" submitted by SmileDirectClub omit the material information that they constitute the parties' "Agreement" governing the use of the Site and SmileDirectClub's "Services," which include the SmileDirectClub aligners.  Finally, the copies of the Terms and Informed Consent submitted by SmileDirectClub do not include the "revision" date, which appears on the versions found on the Internet.

A reasonable consumer, confronted with the SmileDirectClub registration page, would expect that the link for "Terms" would lead to the document setting forth the "terms" of the parties' agreement, and containing any conditions, restrictions or limitations concerning the parties' legal entanglement, including any direction that would affect a party's substantive rights or relationship. Notably, the word "arbitration" does not appear anywhere in the Terms.  Not surprisingly, the document revealed when clicking on "Terms" is labeled at the top, in large bold letters, "Smile Direct Club Terms of Use."  The page has an introductory paragraph that defines the "following

---

[25] Kuehn Decl. Ex. C.
[26] Compare Kuehn Decl. Exs. A & B with Skinner Aff. Exs. 1 & 2.

terms of use" as the "Agreement" and provides that the terms of use "govern[] your use of [the Site], and the shopping and other services (the 'Services') offered on the Site."[27]

The Agreement continues by emphasizing that "[y]our use of the Site and/or registration for any Services will constitute your agreement to comply with the terms of this Agreement.  If you cannot agree to and comply with this Agreement and its requirements, please do not use the Services and exit the Site."[28]

A reasonably prudent person's expectation would have been fulfilled when the person arrived at the tenth heading of the Terms of Use, entitled "Jurisdiction and Governing Law."[29] That heading is in eighteen-point font and bold letters, and clearly and conspicuously alerts the reader to the fact that his or her substantive legal rights regarding the jurisdiction for dispute resolution and governing law are defined in the paragraph that follows.  In clear and conspicuous language, the paragraph identifies the governing law, and directs that disputes be resolved in "**state or federal court** located in Southeastern Michigan."  The paragraph goes on to say that "both parties agree to submit to the exclusive personal jurisdiction and venue of such **courts**."[30]

SmileDirectClub chose the specific language in the Jurisdiction and Governing Law section of the Terms.  Specifically, a reasonable person is led to believe that disputes regarding SmileDirectClub's Site and Services would be resolved in a state or federal court of laws in Michigan and not in arbitration or any other alternative forum for resolving disputes.  The word arbitration does not appear in the SmileDirectClub's Terms.

---

[27] Kuehn Decl. Ex. A at p. 1.
[28] *Id.*
[29] *Id.* at p. 4.
[30] *Id.* (emphasis added).

17

SmileDirectClub's customers were also presented with a hyperlink to SmileDirectClub's "Informed Consent."[31]   The Informed Consent also contains a header that SmileDirectClub omitted from the documents it submitted with its moving papers.  The header states: "Consent and History."  There is no statement that the "Informed Consent" constitutes an "Agreement," much less "the Agreement" between the parties, that the document sets for the terms that govern the consumers use of the Site or SmileDirectClub's services, or that the document contains any terms establishing or altering the parties' legal relationship – other than for SmileDirectClub to obtain the patient's informed consent.  Unlike the Terms, where readers are told that if they are unwilling to agree to the Terms, they should exit and not use the Site or the Services, *there is nothing that alerts the customer in the Informed Consent section that Customers must either agree, or not use the Site or Services*.  At most, a reasonable person would assume that the page is meant to secure the consumer's informed consent to medical treatment, i.e., disclosing the risks of SmileDirectClub's aligners and seeking consent.

Readers of the Informed Consent are, therefore, met with the heading "How Does the SmileDirectClub Aligner System Work."  The paragraph that follows describes how the aligner system works.  The balance of the "Informed Consent" document reflects the physical treatment aspects and risks of aligners.  Following a cursory paragraph purportedly explaining how the SmileDirectClub aligners work, Informed Consent lists Aligner Benefits, Whitening Benefits, Aligner Risks, Whitening Risks, and Healthy Teeth & Gums, all headings that refer to the physical aspects – benefits and risks of aligner treatment.  The purported agreement to arbitrate is slipped in as the eighteenth of nineteen "Aligner Risks," such as "Bite Adjustment" and "Black Triangles."[32]  After "Black Triangles," the document continues with "Whitening Risks."

---

[31] Kuehn Decl. Ex. B.
[32] *Id.* at p. 3.

An arbitration agreement is not a "risk" of using the SmileDirectClub aligners.   No reasonable consumer would expect to find terms concerning his or her legal relationship with SmileDirectClub slipped into a list disclosing health risks of using a particular dental device.

The Informed Consent document concludes with a section titled "Informed Consent" that addresses a customer's consent to engaging SmileDirectClub's aligner treatment, use of personal information, understanding of the aligner treatment, including bite and occlusion risk, and specifically grants to SmileDirectClub, the right to use photographs and use of aligner treatment. The "Informed Consent" section – which purports to set forth what the consumer is consenting to – makes no mention of any agreement to arbitrate.

### 3.      There was No Agreement to Arbitrate

These facts demonstrate that the purported arbitration agreement was neither clear nor conspicuous, and that no reasonably prudent person would have been on inquiry notice of the arbitration terms.   It was not clear because the SmileDirectClub Terms of Use contained a Michigan venue provision, contradicting the arbitration clause.   It was not conspicuous because it was not included in the document labeled "Terms of Use," but instead was hidden in a long list of aligner risks almost all of which describe the physical risks of aligners.

None of SmileDirectClub's authority sanctions the type of trickery SmileDirectClub engaged in – and, still engages in.   Indeed, SmileDirectClub's reliance on *Plazza v. Airbnb, Inc.*[33] for the proposition that the location of the arbitration clause is irrelevant, is plainly in error.   In *Plazza*, the arbitration provision was "toward the end of a long agreement," which was titled "Terms of Service" and which contained a "capitalized admonition warning users to

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS. THESE INCLUDE VARIOUS

---

[33] 289 F. Supp. 3d 537 (S.D.N.Y. 2018).

LIMITATIONS AND EXCLUSIONS, A CLAUSE THAT GOVERNS THE JURISDICTION AND VENUE OF DISPUTES . . . .

*Plazza*, 289 F. Supp. 3d at 543 & 554.  SmileDirectClub, on the other hand, *did not* include the arbitration provision in the document that was labeled "Terms of Use," and that document instead included a "Jurisdiction and Governing Law" section.  Here, SmileDirectClub included the arbitration provision in a document labeled "Informed Consent" and hid the provision as the eighteenth of nineteen "Aligner risks."

Because of the conflicting provisions regarding dispute resolution, all of the cases relied upon by defendant are easily distinguishable.  Thus, none of cases cited or referred to by defendants upholding so called "clickwrap" agreements, do so under the circumstances presented in this case. For example, in *Meyer v. Uber Techs, Inc., 868 F. 3d 66 (2d Cir. 2017),* there was no issue concerning conflicting clauses for arbitration and jurisdiction and governing law.   Similarly, in *Armstead v. Starbucks Corp., 2017 U.S. Dist. LEXIS 190748 (S.D.N.Y. Nov. 17, 2017)*, there were no conflicting "Terms of Use" presented to the Starbucks employee.  Instead, in *Starbucks,* the Court found that there were three identified documents that were clearly and distinctly presented, and labeled, "W-4," "I-9" and "Arbitration Agreement."   The Court further found that each document was presented with a hyperlink labeled "View," and next to the "Arbitration Agreement, parenthetical text states "view required before signing".  The agreement at issue stated expressly that arbitration was the only forum to resolve disputes and that both Starbucks and the employee waived the right to a trial before a judge or jury in federal or state court.  Under these facts, the Court held that the employee electronically agreed to be bound by the explicitly described arbitration agreement.  In *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829 (S.D.N.Y. 2012), the Court approved the enforcement of a forum selection clause where that clause was contained in Facebook's Terms of Use.

Here, where SmileDirectClub has a specific hyperlink to Terms that state that disputes must be resolved in court, the Court should find that the arbitration clause buried deep in the list of Aligner Risks in the "Informed Consent" hyperlink,  was not sufficiently clear and conspicuous to force Plaintiff to arbitrate disputes, even though Plaintiff was required to click on a link stating "I agree" to the referenced hyperlinks.

SmileDirectClub's opening brief does not even acknowledge the existence of the Jurisdiction and Governing Law section in SmileDirectClub's Terms or the conflict with the purported arbitration clause in the Informed Consent.  As such, SmileDirectClub cannot in reply argue that the Jurisdiction and Governing Law section should be read as being consistent with the arbitration term in the Informed Consent.  The Court should not allow SmileDirectClub to argue in reply, for the first time, that the two provisions are complimentary.

Even if the Court finds that SmileDirectClub has not waived the argument, the Court should follow the Second Circuit's analysis in *Applied Energetics, Inc. v. Newoak Capital Mkts., LLC*, 645 F.3d 522 (2d Cir. 2011).  In that decision, the Second Circuit held that an arbitration agreement in an initial agreement between the parties conflicted with a mandatory venue provision in a subsequent agreement and, therefore that the arbitration agreement was not enforceable.  *Id.* at 526-27.  In *Applied Energetics,* the district court granted defendants' motion to compel arbitration, finding that the parties' initial agreement containing an arbitration clause and a latter agreement containing a court adjudication clause, could be read as complimentary.  *Id.* at 524.  On appeal, the Second Circuit reversed finding that the agreement with the court adjudication provision superseded the earlier agreement containing the arbitration clause.  In rejecting the district court's reliance on *Bank Julius Baer & Co., v. Waxfield, Ltd.*, 424 F.3d 278 (2d Cir. 2005) (holding that a subsequent agreement with a court adjudication clause was complimentary with the earlier

21

arbitration agreement), the Second Circuit found that the language in the latter agreement that "'[a]ny dispute' between the parties, 'shall be adjudicated' by specified courts [stood] in direct conflict" with the earlier agreement's language that disputes shall be resolved through binding arbitration. *Id.* at 525. The court found that both dispute provisions were all inclusive and that neither admits the possibility of the other. *Id.* The court also found that use of the word "adjudicated" in the later agreement was "a clear and unmistakable reference to judicial action." *Id.*

The same conclusion should be reached here. The SmileDirectClub "Terms of Use," defined as the parties "Agreement," provides that it governs the use of the SmileDirectClub Site and Services and that the use of the Site and or registration for any Services constitute an agreement to comply with the terms of the Agreement. In the Jurisdiction and Governing Law section, the Terms state that "**any action** based on or alleging a breach of this Agreement **must** be brought in a state or federal court located in Southeastern Michigan."[34] Use of the verb "must" precludes the resolution of disputes in a forum other than a state or federal court in Southeastern Michigan.

Finally, the location of the arbitration clause, particularly where there were multiple options for users does matter. Thus, in *Specht*, where users could obtain software for internet through alternative methods, the court found that the existence of license terms (including an arbitration agreement) on a submerged screen was not sufficient to "place consumers on inquiry or constructive notice of those terms." 306 F.3d at 32. In affirming the district court's holding that the user plaintiff was not bound by arbitration clause, the court held that "a reasonably prudent offeree in plaintiff's position would not have known or learned, prior to acting on the invitation to

---

[34] Kuehn Decl. Ex. A at p. 4 (emphasis added).

download, of the reference to SmartDownload's license terms hidden below the "Download" button on the next screen." *Id.* at 35.

**CONCLUSION**

For the reasons set forth above, the Court should find that the parties did not form an agreement to arbitrate and deny SmileDirectClub's motion to compel.  In the alternative, the Court should order the parties to proceed to expedited discovery and schedule and evidentiary hearing.

Dated:  September 13, 2019         **BRAGAR EAGEL & SQUIRE, P.C**

   <u>  /s/ David J. Stone        </u>
Lawrence P. Eagel
David J. Stone
885 Third Avenue, Suite 3040
New York, NY 10022
Tel: (212) 308-5858
stone@bespc.com

**MOORE KUEHN, PLLC**
Justin A. Kuehn
Fletcher W. Moore
30 Wall Street, 8th Floor
New York, NY 10005
Tel: (212) 709-8245
jkuehn@moorekuehn.com
fmoore@moorekuehn.com

23
